IN THE UNITED STATES
COURT OF FEDERAL CLAIMS
(BID PROTEST)

FILED
APR 4 2016
U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| WORLDWIDE LANGUAGE RESOURCES, LLC | |
| Plaintiff, | |
| v. | CoFC No. 16-424 C |
| THE UNITED STATES, | |
| Defendant. | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**COMES NOW,** Plaintiff WorldWide Language Resources, LLC ("WorldWide"), by and through undersigned counsel, and seeks injunctive and declaratory relief against the Department of the Army (the "Agency," the "Contracting Officer," or the "Army") pursuant to 28 U.S.C. § 1491(b)(1), Fed. R. Civ. P. 65, and Rule 65 of the Rules of the United States Court of Federal Claims ("CoFC R."). By this action WorldWide seeks to enjoin the Army from going forward with award of a contract or contracts under the Solicitation No. W911W4-15-R-0021 (the "Solicitation," "Request for Proposals," or "RFP"), as written for Department of Defense Language Interpretation and Translation Enterprises ("DLITE II") procurement seeking linguists and translators in support of DOD operations in Afghanistan.[1] The basis of WorldWide's protest is that the solicitation as written is ambiguous on what is "relevant past performance," includes what may be restrictive past performance requirements, may have created a sole source procurement without following FAR requirements, and fails to include significant actual costs in

---

[1] The actual supported Army command is the US Army Intelligence and Security Command ("INSCOM").

1

the price evaluation, and includes evaluation factors that do not comply with the FAR or statute. The solicitation is also ambiguous and favors the incumbent on linguist density and location. The agency refused to correct or address these solicitation ambiguities and defects.

## PARTIES

1. Plaintiff, WorldWide, is a New Hampshire limited liability company whose principal office is located at 308 Person Street, Fayetteville, NC 28301.

2. The Defendant is the United States of America acting through the Army.

## JURISDICTION AND STANDING

3. Jurisdiction in this Court is based on the Tucker Act, 28 U.S.C. § 1491.

4. WorldWide has standing as an interested party to bring this action since WorldWide is an actual bidder under the Army's Solicitation whose economic interests are directly affected by the Army's defective RFP terms.

5. WorldWide previously protested these issues to the Government Accountability Office ("GAO") where it was docketed as B-412495.1 *et al*. The GAO's decision was issued on March 23, 2016. A public version of this decision was released on March 30, 2016.

6. Final submissions under the Solicitation are due to be delivered to the Government by May 1, 2016. No award decision has been made by the Army.

## BASIS OF THE PROTEST

**A. The Terms of the Solicitation**

7. The RFP is for multiple Indefinite Delivery, Indefinite Quantity ("IDIQ") foreign language contracts, with contractors to be selected using a Best Value tradeoff. RFP at 23.

8. The estimated contract ceiling is $9.864 billion, with 80 percent awarded to large businesses and 20 percent to small businesses. RFP at 24.

9. Proposal Due Dates: The RFP includes three proposal due dates:

- November 19, 2015 at 1 PM EST for Volume 1. Amendment 4 ¶ 1.

- December 1, 2015 for Volumes 2-5 for Force Projection Pool and Volumes 2-6 for Train & Sustain Pool. Amendment 4 ¶ 1.

- May 1, 2016 for the Defense Base Act ("DBA") quote. Amendment 5 ¶ 18.

10. Concerning the evaluation of past performance, the RFP states as follows:

L.5.5.4.1.1.1 Offerors shall submit information on projects deemed relevant in demonstrating the ability to perform the proposed effort and explain how/why the referenced projects are relevant to the proposed effort. "Relevant" projects are defined as those contracts ongoing or completed that are of comparable magnitude and complexity to those described in Section C, the IDIQ PWS and associated task orders in Section J, Exhibits C.3 and J.2.1 for Force Projection and C.2, J.2.2, and J.2.3 for Train and Sustain), are of a similar dollar value and contract type, and include a similar degree of subcontract/teaming.[2]

11. Concerning the procurement's evaluation factors, Amendment 5[3] states that "For evaluation purposes, the offeror's proposed cost for all DBA (CLINS 0011, 1011, 2011, 3011 and 4011) will be evaluated IAW M.4.6.1.2, M.4.6.1.3 and M.4.6.1.4 but will not be included in the offeror's total evaluated price." See RFP Amendment 5, ¶24.

12. Concerning linguist density the RFP's Performance Work Statement ("PWS"), STO A, paragraph 2.3.1.1. (page 295 of conformed RFP) states "Key management personnel should be

---

[2] Prior to the issuance of Amendment 4 to the RFP, the referenced paragraph stated: "For past performance evaluation purposes, the Government defines "similar dollar value" as $40 Million for the FP Mission Area and $3 Million for the T&S Mission Area." These words were deleted in Amendment 4.

[3] Amendment 5 was issued on November 19, 2015, but is labeled "Amendment 3" in some sections, and "Amendment 5" in others. However, it was issued after Amendment 4. See Fed. Biz Opps entry for DLITE II procurement.

3

appropriately distributed among the linguist density locations and collocated in the immediate vicinity of the assigned linguist population they oversee."

**B. <u>The Solicitation is Ambiguous as to Relevant Past Performance</u>**

13. The solicitation fails to define what dollar value should be used to define "relevant projects." Instead the RFP merely states that "in order…to be considered 'relevant' under the Past Performance factor, it must be of comparable magnitude and complexity to the one described in Section C and the specified sample task orders."

14. However, the RFP never identifies the dollar value or magnitude. Indeed, DLITE II could have a "dollar value" of $9.8 billion (for large business), and the Section C task is approximately $0.6 to $0.9 billion. The figure that should be used is completely ambiguous.

15. Additionally, if INSCOM is seeking as relevant only past performance in the $ 0.6 Billion or more range, then it has effectively excluded all contractors except MEP, LLC,[4] the current incumbent DLITE I contractor. This is a direct violation of the Competition in Contracting Act of 1984 ("CICA"), which requires that solicitations generally permit full and open competition and contain restrictive provisions only to the extent necessary to satisfy the needs of the agency. The procuring agency must establish that a restrictive provision is reasonably necessary to meet the agency's needs.

16. Whereas here the solicitation contains an unnecessary requirement, the criteria must be construed as being unduly restrictive of competition and that, ordinarily, in that circumstance the solicitation should be canceled before award.

---

[4] WorldWide has identified the incumbent contractor as "MEP" because that company used to be "Mission Essential Personnel, LLC;" however, WorldWide is unaware of that company's current name. An internet search indicates that the company identifies itself as "Mission Essential" (formerly Mission Essential Personnel or MEP).

4

17. Here, because of the ambiguity discussed in the dollar value of relevant projects, and by apparently restricting past performance to "relevant projects" which are "of comparable magnitude and complexity to those described in RFP Section C, as required by RFP Section L.5.5.4.1.1.1, AR, Tab 13, the Army appears to have ensured that only one offeror can meet this requirement. Only one contractor, MEP, has had similar experience in contracts over $500 million (in DLITE I). The RFP indicates at least one task order that will have a price of approximately $600 million. MEP's experience is over $1 billion, but no other contractor is even close to this magnitude, and it appears that only MEP's experience will be deemed "relevant" under the RFP.

18. The result will be that all offerors except for MEP must be given a neutral performance rating, while MEP can receive *higher than neutral*.

19. Therefore, by selecting what apparently is a very restrictive requirement for past performance, WorldWide has been seriously prejudiced and will be forced to accept a neutral rating, even though WorldWide's experience in many other, lower priced but still significantly more complex contracts, would indicate its strong experience and ability to perform the work in the RFP.

20. By ambiguously defining past performance thresholds that *imply* a very high dollar amount ($600 million or more), the Army excludes every contractor other than MEP from having the requisite past performance. WorldWide fails to see how a lower dollar value for past performance, that will include non-DLITE I contractors and other experienced language companies, is "more restrictive" than the RFP as written. In fact, it is only the Army that seeks to write a "restrictive" (past) performance requirement. The Army should be required to have real competition for the DLITE II requirement.

## C. The Army has created an improper sole source procurement

21. As noted above, the effect of the ambiguous, but "high bar" dollar amount in the past performance standards is to restrict competition to one company, MEP. If in fact, only one company can meet the past performance requirements, it will likely be the only company with a high technical score. The apparent exclusion of other qualified language companies is the exact definition of a *de facto* sole source procurement.

22. If the Army seeks a sole source procurement to MEP, it must do so in accordance with FAR 6.302-1, and prepare a Justification and Approval as require by FAR 6.303. There is no justification for a sole source, as there is at least one other company, WorldWide that has the proven ability to perform this contract. It has done none of these things, and should therefore not be permitted to conduct a *de facto* sole source procurement.

## D. Exclusion of Defense Base Act Insurance

23. The RFP as written excludes from the offerors costs a requirement for Defense Base Act ("DBA").

24. For the Court's information DBA insurance is similar to workman's compensation insurance but there are distinctions:

- Domestic Workers' Compensation—is a form of insurance that provides benefits to employees who suffer injury or illness as a result of their job-related duties. The requirements for employers to purchase Workers' Compensation are determined at the individual state level, and can vary depending on the number of employees and gross payroll amount.

- Defense Base Act (DBA) Insurance is an enhanced form of Workers' Compensation that is specific to contractors performing work overseas under a Government contract. Contractors are required to purchase DBA Insurance just like employers in the United States are required to purchase Workers' Compensation Insurance to cover employees stateside based on state statutes. The Defense Base Act is a division of the U.S. Department of Labor's Longshore and Harbor Workers' Compensation Act that was enacted in 1941 to cover U.S. civilian workers while working overseas under U.S. Government contracts.

> The DBA has many various sections and benefits (such as, "zone of special danger", "war hazard", etc.) that are not applicable to domestic worker's compensation. A DBA has jurisdiction over the same claim filed in a state.

This is improper for two reasons.

25. **First, the insurance industry reason**. The insurance industry knows well that there are different rates for different contractors, and costs of premiums vary depending on risk mitigation and past performance. See Exhibit 1, Declaration of Jason G. Allen ("Allen Dec.") at ¶ 5. Indeed, INSCOM has a request for information (comments) on the street now, W911W4-16-R-DBAINSCOM, where it sought comments on the idea of splitting out the DBA in some unspecified manner.

26. According to Mr. Allen (an insurance industry executive):

> This is my understanding of how DBA rates are calculated: When presented with a new contract requiring DBA, the carrier considers the following factors: Company/Contractor, OCONUS Location, Contracting Agency, Prime vs. Sub Relationship, 4 year Loss History, Risk Mitigation Strategy, 4 year Payroll History, OCONUS Resources. When presented with a new client, carriers focus on previous loss history as well as present/future strategies for risk mitigation. Example: a contractor that embeds nurses or a CNA (certified nursing assistant) with their deployed members to ensure there is access to care to prevent a large cumulative claim is one that would likely obtain a more favorable rate compared with a contractor that simply provides people in/people out which could result in year over year losses. Having DOD business obtained on the open market has resulted in a significant savings for contractors and the Government over the long term.

Allen Dec. at ¶ 8.

27. The DBA insurance industry is like all other insurance practices in the US. The industry *stresses the need for risk mitigation in order to reduce costs.* Just like car or home insurance, DBA premiums are based on risk mitigation, and vary in a commercial environment. INSCOM seeks to eliminate one element of cost—and a very large one (several hundred million dollars) by somehow writing that cost out of this procurement. That makes no sense whatsoever. The

7

Government must take advantage of costs that its contractors are likely to incur, since all the DBA costs will be paid by the government—whether as part of DLITE II or some other DBAINSCOM contract award. The government would *never* attempt to delete the cost of insurance from a transportation contract (e.g. a contract to transport Army personnel from the Pentagon to locations within Washington, DC or its environs). Indeed, such an insurance cost (depending on the prior risk history of the contractors) could have a significant impact on contract price and therefore selection.

28. The cause of the protest is INSCOM's attempt to create a situation where **only MEP** will have the requisite past performance to achieve high evaluation scores. Furthermore, there is no exclusive "teaming agreement" between WorldWide or anyone else that is crimping competition. Only the normal play of the insurance market place, which bases premiums on risk (as noted above in the declaration of Mr. Jason Allen) is at issue here. INSCOM seeks to undermine the regular competitive commercial insurance industry forces—a direct violation of the Federal Acquisition Streamlining Act—and remove an important, commercial cost component from the price evaluation.

29. WorldWide submits that INSCOM is seeking to eliminate an important component of cost from the competition, and eliminate incentives for contractors to improve their risk mitigation strategies. The INSCOM proposal essentially negates any potential price advantage that a contractor with good risk mitigation can offer. Improved risk mitigation strategies could have a significant price impact on US Army procurement. The proposal in the RFP washes out these commercial advantages, and causes a disadvantage for the best commercial risk mitigation companies, something that is totally counterproductive for the Army.

30. The attempt to exclude DBA costs from the evaluation of proposals is directly contrary to the GAO's and this Court's position on costs. Agencies are required to consider the cost to the government in evaluating competitive proposals. See Glenn Defense Marine (Asia) PTE Ltd. v. United States, 97 Fed. Cl. 568, 577 (2011); Health Servs. Int'ls, Inc., B-247433 et al, June 5, 1992, 92-1 CPD ¶493. An agency may not use an evaluation method that produces a misleading result. Id. Any method chosen must include some reasonable basis for evaluating or comparing relative proposal costs, so as to establish whether one offeror's proposal will be more or less costly to another proposal. Glenn Defense Marine, 97 Fed. Cl. at 577; SmithKline Beecham Corp., B-283939, Jan 27, 2000, 2000 CPD ¶ 19. The Army has offered no reason here to indicate how it would somehow "normalize" costs. If Army proposes no way to "normalize" costs, then it must consider them in evaluating the proposals.

31. As the chart in Mr. Allen's Declaration indicates there is a wide disparity in the potential DBA insurance costs between WorldWide and the incumbent and that Army needs to include this variation in the evaluation scheme. See Allen Dec. at ¶¶ 10-11.

32. DBA represents a very significant cost, and must be considered. Any kind of evaluation that excludes over $200 million in cost difference (the likely difference between offeror's DBA costs) would be highly misleading, and very costly to the government.

**E. Linguist Density is Ambiguous**

33. In reviewing the RFP WorldWide asked the following question concerning the issue of "linguist density":

> The PWS states "Key management personnel should be appropriately distributed among the highest linguist density locations and collocated in the immediate vicinity of the assigned linguist population they oversee." Could the Government please provide the current or anticipated linguist

density details for the OFS Area of Operations so that Offerors can plan accordingly to meet this requirement?

34. The Government's answer on November 10, 2015 was a refusal to respond to this question, in their Q&A attachment, along with Amendment 004.

35. Based on the Government's failure to address this issue, WorldWide asked the following question:

> Could the Government please clarify the task conditions and standards by which offerors will be evaluated with regard to management personnel proposed without knowing the linguist density by location? A common factor in determining the amount of management needed is by the number and location of staff being supported. To adequately respond to STO Alpha requirements to "appropriately distribute" management personnel, either the distribution of linguist density locations, or a definition of "appropriate" management staffing is required. Without linguist density locations or a definition of appropriate management staffing, this creates an ambiguous situation where only the incumbent contractor would be able to appropriately distribute management personnel across the "highest linguist density locations.

36. The incumbent alone has an intimate knowledge of both the Government's requirements. Specifically, the Army's treatment of non-incumbents with respect to linguist density is unfair and highly prejudicial, because it makes it impossible for non-incumbents to prepare a logical proposal and impossible for the government to evaluate proposals even-handedly.

37. WorldWide first asked about linguist density on October 28, 2015. The question concerned Sample Task Order ("STO") Alpha of the Performance Work Statement ("PWS"), paragraph 2.3.1.1, Key Personnel (page 296 of the RFP at the time, it is now on page 295 of the Amendment 0005 conformed RFP).

38. The problem with this ambiguity in the RFP, and the evaluation standards relating to linguist density is that there must be some kind of metric for offerors to be evaluated equally, or the Government must provide historical figures for density. The incumbent is the only offeror with

access to historical information spanning the last five years. As all offerors are required to price the same technical exhibit with regard to the linguists, the technical solution and resultant price for each offeror will rest heavily on the management structure developed in order to support this task order (and be compliant with STO Alpha 2.3.1.1). Failure to provide density gives a significant and unreasonable advantage to the incumbent.

39. While the RFP does describe the magnitude (number and complexity) of the effort and also shows the location of the major commands. The Government does not disclose the location of the linguists in the solicitation. They merely state that more than 96% of the linguists work for the G-2 (Intelligence Directorate). These linguists are spread over the entire country/region.

40. The Government refused to disclose the locations, thus not affording WorldWide the same information that the incumbent (MEP) has to develop the staff requirements. The Government stated in the solicitation that linguists would not hold a managerial position, further tying the offeror's hands. Absent this restriction WorldWide could propose as follows, "In locations without a designated manager, WorldWide will appoint the senior linguist to perform those administrative duties."

41. To develop the staff and management requirements, there are two factors – dispersion and density by location. WorldWide's formula to analyze manager-to-linguist ratio is complicated by the dispersion of the linguists. For example, one manager could easily manage 100 linguists if they were co-located. Take the same 100 linguists and put them in five locations spread across a war-torn country with challenged communications systems, it would take five managers. To add another complication, knowing the unit of linguist assignment is another advantage known only to the incumbent. If WorldWide were told there are 500 linguists assigned to Bagram Air Force

Base, that might mean five managers. If they were assigned to ten units at Bagram, it might mean as many as 10 managers.

42. Here then is the inherent problem with the RFP as written, WorldWide has enough knowledge of the situation to know that 1,100 linguists are not sitting at the INSCOM G-2 directorate, but not enough to know where exactly they are to build WorldWide's requirements and thus the proposal. Only the Government and the incumbent have this information. Absent this knowledge WorldWide is forced to either increase its pricing to make sure it has enough managers and staff, or risk not being technically compliant by not having a reasonable number of managers/staff.

## COUNT I
### (Violation of Law and Regulation)

43. WorldWide incorporates by reference the allegations set forth above in paragraphs 1 through 42.

44. FAR 1.102 requires Contracting Officers to "[c]onduct business with integrity, fairness, and openness."

45. FAR 1.102-2(c) requires the Government to "use sound business judgment, and comply with applicable laws in dealing with contractors and prospective contractors" and to treat all contactors and prospective contractors "fairly and impartially."

46. 10 U.S.C. Section 2305(a)(1)(B)(ii) prevents the Government from including in its solicitations restrictions on competition beyond those necessary to satisfy agency needs.

47. FAR 6.302-1 and FAR 6.303 provide the requirements for the Government's justification of a sole source procurement. The Army has followed none of these requirements here.

48. FAR 15.304(c)(1) and 10 U.S.C. Sec. 2305(a)(3)(A)(ii) require that the price or cost of the services to the government shall be evaluated in every source selection each solicitation shall include the cost or price to the federal government as an evaluation factor so that such factor will be considered in making the source selection).

49. As described above the Army's Solicitation as written is ambiguous on what is "relevant past performance," includes what may be restrictive past performance requirements, may have created a sole source procurement without following FAR requirements, and fails to include significant actual costs in the price evaluation, and includes evaluation factors that do not comply with the FAR or statute. The solicitation is also ambiguous and favors the incumbent on linguist density and location. The agency refused to correct or address these solicitation ambiguities and defects.

50. Furthermore, the evaluation fails to include all of the actual costs to the Government in the form of DBA insurance so that the Government's source selection will not be based on the actual costs of performance to the Government.

51. The Army's actions described above have the effect of benefiting the incumbent offeror to the detriment of other offerors. As such the Army's actions, were not based upon an open, fair and impartial assessment of the offerors' capabilities or the Government's legitimate needs.

52. The Agency's decision to conduct such a biased procurement were motivated by a lack of good faith and bias against WorldWide and other non-incumbent offerors and was not based upon an open, fair, and impartial review of WorldWide's offer or the Army's proper consideration and assessment of its needs.

53. WorldWide has been and will be directly harmed by the Army's failure to conduct its

business with integrity, fairness, and openness as required FAR 1.102 and 1.102-2(c).

## COUNT II
### (Arbitrary and Capricious Agency Action)

54. WorldWide incorporates by reference the allegations set forth above in paragraphs 1 through 53.

55. As described above the Army's Solicitation as written is ambiguous on what is "relevant past performance," includes what may be restrictive past performance requirements, may have created a sole source procurement without following FAR requirements, and fails to include significant actual costs in the price evaluation, and includes evaluation factors that do not comply with the FAR or statute. The solicitation is also ambiguous and favors the incumbent on linguist density and location. The agency refused to correct or address these solicitation ambiguities and defects. These actions on the Army's part were arbitrary and capricious and not in conformance with federal procurement law or regulation.

56. WorldWide has been and will be directly harmed by the Army's actions as described above.

## COUNT III
### (Breach of Duty of Good Faith and Fair Dealing)

57. WorldWide incorporates by reference the allegations set forth above in paragraphs 1 through 56.

58. The Army has breached the duty of good faith, fair dealing, and honest consideration that the Army entered into with WorldWide when it drafted the RFP as written because it is ambiguous on what is "relevant past performance," includes what may be restrictive past performance requirements, may have created a sole source procurement without following FAR

requirements, and fails to include significant actual costs in the price evaluation, and includes evaluation factors that do not comply with the FAR or statute. The solicitation is also ambiguous and favors the incumbent on linguist density and location. The agency refused to correct or address these solicitation ambiguities and defects.

59. The Agency's actions were the result of the Army's lack of good faith and bias against WorldWide, and were not based upon an open, fair and impartial review the Government's needs.

60. WorldWide has been harmed by the Army's breach of the duty of good faith and fair dealing.

## RELIEF REQUESTED

**WHEREFORE** Plaintiff, WorldWide, respectfully requests that the Court enter judgment in favor of the Plaintiff against the United States and further requests the following relief:

1. That the Court enjoin the Government from awarding or beginning performance of any contract awarded under the RFP as currently drafted.

2. That the Court enjoin the Government from awarding or beginning performance of the RFP as written the terms benefiting the incumbent offeror.

3. That the Court order the Army revise the RFP to make it legal under CICA; and

4. The Court award WorldWide its reasonable costs and attorneys' fees, and such further legal and equitable relief that the Court deems appropriate.

Respectfully submitted,

Dated: April 4, 2016                    By: /s/James S. DelSordo
                                            James S. DelSordo, Esq.
                                            James S. Phillips, of Counsel
                                            Julie M. Nichols, of Counsel
                                            Argus Legal, PLLC
                                            9255 Center St.
                                            Suite 307
                                            Manassas, VA 20110
                                            Tel: (703) 368-8770
                                            Fax: (703) 368-8772
                                            delsordo@arguslawfirm.com

                                        Counsel for Plaintiff WorldWide Language
                                         Resources, LLC

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(BID PROTEST)

| | |
|---|---|
| WORLDWIDE LANGUAGE RESOURCES, INC. | |
| Plaintiff, | |
| v. | CoFC No. _____ |
| THE UNITED STATES | |
| Defendant. | |

## DECLARATION OF JASON G. ALLEN

I, Jason G. Allen, hereby make the following Declaration, pursuant to 28 U.S.C. §1746:

1. I am President of an insurance brokerage that sells over $10 million annually of Defense Base Act ("DBA") insurance. Over the last 10 years I personally have sold over $40 million worth of DBA insurance for linguist specific US Government contracts. My clients include many of the larger and smaller companies that hold government contracts for performance overseas, and therefore we have considerable experience in this matter. I expect to provide DBA insurance for one or more contractors who receive awards under contracts awarded pursuant to the Department of Defense (U.S. Army) Language Interpretation and Translation Enterprises Solicitation, No. W911W4-15-R-0021 ("DLITE II").

2. For at least 10 of the last fifteen years, I have sold DBA insurance to WorldWide Language Resources, Inc. ("Worldwide").

3. I do not sell DBA insurance to the incumbent contractor I have no specific knowledge of the incumbent's DBA rates or what strategies it employs to mitigate losses and/or reduce DBA premiums.

4. Worldwide employs a loss mitigation program that is a factor in keeping its DBA rates lower than most vendors providing linguists in high-risk areas.

5. Rates vary for many reasons, but it is my opinion that two or more vendors performing the same work in the same location could pay significantly different DBA

1

EXHIBIT 1

rates based on mitigation efforts to keep personnel safe and away from potentially injury-causing scenarios. Rates may also vary because many DBA claims are covered under the War Hazard Compensation Act and are reimbursed to the carrier by the government. On the other hand, non-War Hazard Compensation Act DBA claims are not reimbursed and could drive premiums higher.

6. Based on my knowledge of DBA rates for linguists performing in high-risk areas, which includes areas where Worldwide and the incumbent are both performing, Worldwide has one of the lowest DBA rates in the industry. This rate currently stands at approximately 20%. For every $100 of payroll, Worldwide spends $20 on DBA premiums. On $100 million of annual payroll, Worldwide would spend $20 million on DBA premiums. By way of comparison, a company with a 40% premium would rate $40 million premium on the same $100 million annual payroll. Over five years, this would be approximately a $100 million savings on DBA premiums assuming rates were constant.

7. Because of increased DBA claims arising from linguists working in high risk areas, it is my experience that fewer carriers are willing to write DBA for linguists and that rates for such coverage have increased somewhat dramatically unless the contracting company has, in place, mitigation strategies.

8. This is my understanding of how DBA rates are calculated: When presented with a new contract requiring DBA, the carrier considers the following factors: Company/Contractor, OCONUS Location, Contracting Agency, Prime vs. Sub Relationship, 4 year Loss History, Risk Mitigation Strategy, 4 year Payroll History, OCONUS Resources. When presented with a new client, carriers focus on previous loss history as well as present/future strategies for risk mitigation. Example: a contractor that embeds nurses or a CNA (certified nursing assistant) with their deployed members to ensure there is access to care to prevent a large cumulative claim is one that would likely obtain a more favorable rate compared with a contractor that simply provides people in/people out which could result in year over year losses. Having DOD business obtained on the open market has resulted in a significant savings for contractors and the Government over the long term.

9. I have attended Department of Labor ("DOL") conferences on DBA. I understand that DBA is mandatory coverage for US DOD contractors providing personnel to overseas duty locations. It is my understanding that whoever wins the contract for DLITE II will have to provide DBA coverage to its deployed linguists. Since the cost of the DBA could vary significantly based, at least in part, on the vendor's prior history for mitigation, the government could spend far more on premiums with one vendor than another. On a large procurement like DLITE II, this amount would, in my opinion, very likely exceed $100 million in additional premiums.

10. In my opinion and experience, it is highly unlikely that the premiums for different vendors providing the same type of work in the same area would be the same.

2

As a broker, part of my job is working to get the best rate for my clients, all factors considered.

11. To present an example of how much DBA rates and costs could vary, please see the table below. While this table only represents an illustrative, estimated example, the table takes what I, in my professional opinion consider to be a conservative approach to showing how DBA premium savings could be estimated for DLITE II.

| YEAR | PAYROLL ESTIMATE | WWLR RATE | WWLR PREMIUM | EST INCUM-BENT RATE | EST INCUM-BENT PREMIUM | DIFFERENCE WWLR AND INCUMBENT | CUMULATIVE DIFFERENCE BY YEAR |
|---|---|---|---|---|---|---|---|
| 1 | $300 mil | 20% | $60 mil | 40% | $120 mil | $60 mil | $60 mil |
| 2 | $300 mil | 26% | $78 mil | 43% | $129 mil | $51 mil | $111 mil |
| 3 | $300 mil | 32% | $96 mil | 46% | $138 mil | $42 mil | $153 mil |
| 4 | $300 mil | 38% | $114 mil | 49% | $147 mil | $33 mil | $186 mil |
| 5 | $300 mil | 44% | $132 mil | 52% | $156 mil | $24 mil | **$210 mil** |

The example assumes the following:

- Estimated total employee compensation was assumed to be the same for both contractors on the Sample Task Order A (STO A).
- WorldWide's DBA rate begins with their approximate 20 percent current linguist DBA rate then escalates this rate at 6 percent in each of the subsequent years..
- The incumbent's DBA rate begins at 40 percent, and is then escalated three per cent in each of subsequent years.

The illustration demonstrates that the DBA premium cost would be $210 million more for the incumbent than for WorldWide, and this significant cost must be borne by the taxpayer.

12. Finally, it is my opinion that each vendor bidding DLITE II should supply their own DBA quote and their DBA premium should be included in the cost of their proposal

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _April 3, 2016_ (date)

_Jason G. Allen_

3