# United States Court of Federal Claims

No. 16-424 C
(Filed: June 2, 2016)
Reissued: June 22, 2016[1]

| | |
|---|---|
| WORLDWIDE LANGUAGE RESOURCES, LLC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant | ) ) |
| and | ) ) |
| MISSION ESSENTIALPERSONNEL, LLC., | ) ) ) |
| Defendant-Intervenor. | ) ) |

Pre-award Bid Protest

*James S. DelSordo*, Argus Legal, PLLC, Manassas, VA, attorney for plaintiff.

*James Sweet*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant.

*Craig A. Holman*, Arnold & Porter LLP, Washington, DC, attorney for defendant-intervenor.


## OPINION AND ORDER

***SMITH*, Senior Judge**

This pre-award bid protest comes before the Court on the parties' cross-motions for judgment on the Administrative Record.  Plaintiff, WorldWide Language Resources, LLC ("WorldWide"), challenges the Department of the Army's ("Army" or "Agency") Solicitation

---

[1] An unredacted version of this opinion was issued under seal on June 2, 2016.  The parties were given an opportunity to propose redactions, but no such proposals were made.

No. W911W4-15-R-0021 ("Solicitation," "Request for Proposals," or "RFP").  Plaintiff alleges that the Solicitation is a *de facto* sole source procurement with vague and ambiguous terms. Plaintiff requests that the Court declare that the Solicitation is a violation of law and regulation, the Army acted arbitrarily and capriciously in refusing to address solicitation ambiguities, and the Army breached the duty of good faith and fair dealing in drafting ambiguous terms for "relevant past performance."  For the following reasons, the Court must deny this protest.

## I.      Findings of Fact

On October 9, 2015, the Department of the Army Intelligence and Security Command ("INSCOM") issued RFP W911W4-15-R-0021.  Administrative Record, page 1 (hereinafter "AR __.").  The Solicitation seeks to award the Department of Defense Language Interpretation and Translation Enterprise II ("DLITE II") contract, a multiple-awardee indefinite delivery, indefinite quantity ("IDIQ") contract for linguist services supporting military operations internationally.  AR 1461.  DLITE II is a best value trade-off procurement with an estimated ceiling of $9.864 billion.  AR 1431.  Through this Solicitation, INSCOM intends to cover two mission areas: Train and Sustain Operations and Force Projection ("FP").  *Id.*

WorldWide is competing for the FP mission area.  AR 1970.  The FP requires "translation and interpretation services worldwide in support of forces engaged in humanitarian, peacekeeping, contingency, and combat operations without a well-defined timeframe or quantity for delivery."  AR 1495.  INSCOM anticipates awarding up to ten or fifteen IDIQ contracts with a base five-year period and an optional subsequent five-year option period.  *Id.*  Each related task order will have a one-year base period with up to four subsequent one-year option periods.  *Id.*

The Agency received nine proposals for the FP mission area.  AR 1924.  Offerors will be evaluated under the following four factors: Technical, Small Business Participation, Past Performance, and Price.  AR 1853.  The Technical factor is the most important factor, the Small Business and Past Performance factors are equally weighted, and the Price factor is the least important factor.  *Id.*  The Solicitation includes the following: a Performance Work Statement ("PWS") for the DLITE II IDIQ contract, AR 1461-62, a FP mission area PWS, AR 1495-1525, and a Sample Task Order ("STO") Alpha for Afghanistan.  AR 1713-38.

### A.      Technical Factor

The Technical factor has the following three equally important subfactors: technical approach, staffing plan, and transition plan.  AR 1853-54.  The staffing plan subfactor requires that offerors describe the "processes and procedures for identifying, recruiting, hiring, screening, and retaining sufficient numbers of qualified, trained/certified, and cleared personnel to meet stated Government objectives for each Sample Task Order in the respective mission area."  AR 1838.  Additionally, offerors are asked to identify how they will provide that "[k]ey management personnel [are] appropriately distributed among the highest linguist density locations and collocated in the immediate vicinity of the assigned linguist population they oversee."  AR 1723.

The Solicitation indicates that the Army will require 1,135 linguists to be spread across multiple locations in Afghanistan.  AR 1742.  The purpose of requiring managers to be collocated with linguists is to avoid remote management.  AR 1935.

WorldWide requested more information about the locations and density of linguists at each location, which the Agency denied.  AR 1083-84.  The Army indicated that it "does not intend for an offeror to identify, in its proposal, the exact location in Afghanistan for placement of its management personnel.  In the same manner, the Army does not intend for an offeror to identify the exact locations where the linguists are placed."  AR 1934.  INSCOM will not assign linguist locations and density until after the award and based on its future needs.  *Id*.  The locations and density of linguists are both classified and unknown as "locations are subject to change at any time based on variables that impact the location of US Forces in a contingency environment like Afghanistan."  AR 1933-35.

### B.    Past Performance Factor

The Solicitation requires information on relevant ongoing and past performance of a similar nature to that of the DLITE II contract.  AR 1842.  Specifically, it requires that offerors submit "up to three (3) relevant and recent (within three (3) years from the date of proposal submission due date) customer/client references" for contracts of a "similar size, scope, and nature to the scope of work identified [in the Solicitation]."  AR 385.  "Relevant" was originally defined as a contract "ongoing or completed that [is] of comparable magnitude and complexity" to the DLITE II IDIQ PWS.  AR 386.  The RFP states the following:

> Offerors shall submit information on projects deemed relevant in demonstrating the ability to perform the proposed effort and explain how/why the referenced projects are relevant to the proposed effort.  "Relevant" projects are defined as those contracts ongoing or completed that are of comparable magnitude and complexity to those described in Section C, the IDIQ PWS and associated task orders in Section J, Exhibits C.3 and J.2.1 for Force Projection and C.2, J.2.2, and J.2.3 for Train and Sustain.

AR 1424.  Amendment 1 modified the original definition by adding a $40 million requirement for the ongoing or completed projects to be relevant.  AR 529.  INSCOM proceeded to receive numerous requests to reconsider the $40 million requirement because it precluded participation by many offerors and did not represent most of the task orders under the DLITE I contract.  AR 600.  INSCOM subsequently removed the $40 million requirement in Amendments 4 and 7.  AR 622.  Amendment 7 defines "relevant" as contracts that are "of a similar dollar value and contract type, and include a similar degree of subcontract/teaming."  AR 1424.

Offerors with substantially similar past experience will receive a "very relevant" past performance rating.  AR 1857.  If an offeror has some past experience within the same or similar scope of work as described in the Solicitation, it will receive a "relevant" or "somewhat relevant" rating.  *Id*.  If an offeror does not have relevant past performance, it will not be disqualified;

instead, it will receive an "unknown" or "neutral" rating. AR 1857-58. The provisions of the Solicitation do not indicate that an offeror without relevant past performance will be disqualified based on a lack of similar experience alone. *Id*.

### C.    Price Factor and Defense Base Act Insurance

Every offeror is required to have Defense Base Act ("DBA") insurance in order to perform under the Solicitation. AR 1122. The Solicitation originally included the cost of DBA insurance quotes as part of the total evaluated price. AR 398. However, due to a November 13, 2015, protest by the intervenor, Mission Essential Personnel, LLC ("MEP"), challenging the inclusion of DBA insurance costs in the total evaluated price, INSCOM removed DBA insurance quotes from the total evaluated price in Amendment 5. AR 1129-30. This Amendment states that "[t]he Government will calculate a 'Total Evaluated Price' for each offeror's proposal by adding together the evaluated price of all [contract line item numbers (CLINs)], except those CLINs for DBA, including options." AR 1858.

The RFP as currently issued excludes the cost of obtaining DBA insurance from the offerors' evaluated price. AR 1132. The contracting officer indicated that this is because initial DBA insurance quotes do not accurately depict the likely costs INSCOM will incur throughout the life of the contract. AR 1929. Substantial performance in a combat zone impacts loss history, and loss history has a significant impact on specific DBA rates. AR 1961, 1929. As such, offerors with limited experience in combat zones will have low initial DBA insurance quotes. AR 1929. However, upon being awarded the contract "an offeror with a low DBA cost at the time of award due to a lack of loss history will most likely face an increase in cost of DBA insurance as it performs under the contract." *Id*. Due to the inconsistencies between pre-award DBA quotes and predicted future costs once the linguists start performing in a combat zone, the contracting officer elected to exclude DBA insurance quotes from the total evaluated price as of November 18, 2015. AR 1962. The contracting officer specifically stated the following:

> [T]he result of including DBA cost in the total evaluated price is an unfair advantage to any offeror who has not performed this type of requirement in the past…. [T]he best way to fairly evaluate all offerors for this procurement with respect to DBA insurance is to exclude the price from the total evaluated price and evaluate the DBA cost for realism, reasonableness, and completeness.

AR 1929, 1957.

In removing DBA costs from the total evaluated price, the contracting officer attempted to even the playing field between offerors with different levels of combat experience. AR 1961. Offerors with limited combat experience will receive initial DBA quotes that are significantly lower than the actual projected cost of DBA insurance over the lifetime of the contract. *Id*. These rates are misleading, inaccurate, and short lived due to increasing loss throughout the contract period. AR 1123-24. Offerors with a history of performance in combat zones will have

a significantly higher DBA insurance quote than those offerors with limited experience in combat zones. Additionally, the low cost of DBA insurance will rapidly increase for offerors with lower DBA quotes with the increased losses associated with performance in Afghanistan. AR 1961-62.

### D.    GAO Protest

On December 17, 2015, WorldWide filed a protest with the GAO alleging the following: (1) the Solicitation is vague with respect to past performance requirements, (2) the Solicitation does not provide offerors with information about where INSCOM will require linguists or where INSCOM has historically located linguists, and (3) the Solicitation improperly fails to include DBA insurance costs in offerors' total evaluated prices. AR 1867-69. The GAO denied all three grounds for protest. AR 1969. This complaint followed, challenging the same Solicitation requirements related to linguist density and location, past performance, and DBA insurance. *See* Complaint, ECF No. 1 ("Compl.").

## II.    Discussion

In its Motion for Judgment on the Administrative Record ("MJAR"), plaintiff states that "the basis of WorldWide's protest is that the record in this matter demonstrates that the solicitation as written is ambiguous on what is 'relevant past performance,' includes what are restrictive past performance requirements, creates a sole source procurement without following [Federal Acquisition Regulation ("FAR")] requirements, and fails to include significant actual costs in the price evaluation, and includes evaluation factors that do not comply with the FAR or statute." MJAR at 1-2, ECF No. 18. Plaintiff also alleges that "the solicitation was changed to its present defective form at the specific request of the Intervenor and is also ambiguous and clearly favors the Intervenor/incumbent on linguist density and location." *Id*. at 2.

### A.    Jurisdiction and Standard of Review

This Court has jurisdiction over bid protest actions pursuant to 28 U.S.C. § 1491(b). The Court evaluates bid protests under the Administrative Procedure Act's standard of review for an agency action. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Under Rule 52.1 of the Rules of the Court of Federal Claims, the parties are limited to the AR, and the Court makes findings of fact as if it were conducting a trial on a paper record. *See id*. at 1354. Looking to the AR, the Court must determine whether a party has met its burden of proof based on the evidence in the record. *Id*. at 1355.

Standing in bid protests is framed by 28 U.S.C. § 1491(b)(1) which requires the bid protest to be brought by an "interested party." A protestor is an "interested party" if it is an "(1) actual or prospective bidder and (2) possess[es] the requisite direct economic interest." *Weeks Marine, Inc., v. United States*, 575 F.3d 1359 (Fed. Cir. 2009) (citing *Rex Serv. Corp. v. United*

*States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006)).  "To prove a direct economic interest as a putative prospective bidder, [the bidder] is required to establish that it had a 'substantial chance' of receiving the contract." *Id.*; *see also Info. Tech. & Appl. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("To establish prejudice, [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."); *see also Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1580 (Fed. Cir. 1996).  The nature of the protest will dictate the necessary factors for a "direct economic interest." *Sys. Appl. & Techs. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012).  In pre-award protests, the plaintiff must show "a non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine*, 575 F.3d at 1362.

### B.    Linguist Location and Density

WorldWide argues that the Solicitation is ambiguous as to linguist location and density, which creates an unfair advantage for MEP.  Essentially, plaintiff alleges that because MEP is the incumbent, MEP has intimate knowledge of the Government's requirements that has not been afforded to the other offerors.  MJAR at 10.  Plaintiff further states that "the Army's treatment of non-incumbents with respect to linguist density is unfair and highly prejudicial, because it makes it impossible for non-incumbents to prepare a logical proposal and impossible for the government to evaluate the proposals even-handedly." *Id.*  Arguing that the technical solutions for each offeror will be determined by the management structure developed, plaintiff seeks knowledge on the locations and density of active troops and their linguists in Afghanistan to ensure fairness for all offerors.

The Solicitation states that "[k]ey management personnel should be appropriately distributed among the highest linguist density locations and collocated in the immediate vicinity of the assigned linguist population they oversee." AR 1723.  WorldWide argues that, because only MEP has the historical figures from the last five years, only MEP can provide an adequate technical solution with the appropriate management structure.  MJAR at 27.  WorldWide alleges that "[a]bsent this knowledge [about the exact locations of the linguists] WorldWide is forced to either increase its pricing to make sure it has enough managers and staff, or risk not being technically compliant by not having a reasonable number of managers/staff." MJAR at 29.  As incumbent has this information, MEP is at an advantage. *Id.*

The Solicitation includes adequate information for offerors to intelligently compete for this award.  In addition to providing information regarding the number of required linguists (1,135), STO Alpha identifies the locations of the military commands in Afghanistan, including the Train, Advise and Assist Command locations, the Region Command locations, and the current US Forces-Afghanistan locations that the task order will support.  AR 1713-15.  Despite this, WorldWide wants more information on location and density.  MJAR at 28-29.  WorldWide argues that "the Army could easily resolve [this advantage] by providing that information [on current location and densities] to the field," speculating that the classified information could be disclosed in a classified annex to the Solicitation.  MJAR at 29-30.  This information on current

linguist location and density is irrelevant, as it does not accurately reflect future linguist locations and densities.

Even if the location of current linguists was not considered classified information, "locations are subject to change at any time based upon the many variables that impact the location of US Forces in a contingency environment like Afghanistan." AR 1935. The Solicitation compensates for this by merely requiring that offerors "propose a management structure to oversee the number of linguists for STO Alpha." AR 1934. Furthermore, it has been made clear that "[t]he Army does not intend for an offeror to identify, in its proposal, the exact locations in Afghanistan for placement of its management personnel. In the same manner, the Army does not intend for an offeror to identify the exact locations where the linguists are placed." *Id.* The Solicitation is simply asking for a general staffing plan to accommodate the 1,135 linguists. Offerors do not need to know linguist density and locations in order to create a general staffing plan.

The decision of whether or not to provide the current locations of linguists in Afghanistan is at the discretion of the Agency. The Court, in *CHE Consulting, Inc. v. United States*, stated that "where acquisitions concerning national defense and security are involved, the Court must afford even wider deference to the agency." 78 Fed. Cl. 380, 387 (2007). The linguists currently provided by the DLITE I contract are co-located with US forces in "inherently dangerous" locations across Afghanistan. AR 1432. Those locations were intentionally excluded because providing that information would "impact the classification level" of the procurement. AR 1933. The Agency acted well within the bounds of its discretion in refusing to release classified information related to national defense and security, regardless of WordWide's allegations that it's not fair. Further, the information the plaintiff wants is information the Government has not yet created.

C.    **Relevant Past Performance**

WorldWide argues that the Solicitation is both ambiguous and unduly restrictive as to relevant past performance. Specifically, plaintiff takes issue with the Solicitation's failure to define what dollar value should be associated with "relevant projects." MJAR at 5. The GAO stated that "in order for an ongoing or completed project to be considered 'relevant' under the Past Performance factor, it must be of 'comparable magnitude and complexity to one described in Section C and the specified sample task orders.'" AR 1900. WorldWide objects to this vague language, arguing that it would be impossible to know whether past performance is relevant without a dollar value to which it can be compared. MJAR at 14-15.

These allegations have no merit. The Solicitation need only "provide[] sufficient information to allow offerors to bid intelligently and to allow the agency to meaningfully evaluate competing proposals." *Glenn Defense Marine (Asia) PTE, LTD v. United States*, 97 Fed. Cl. 568, 578 (2011). The Agency is not required to define relevant past performance with a dollar value. Agencies have "broad discretion in selecting a method for evaluating offerors' past

performance, so long as the solicitation describes the chosen method." *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 718 (2010). This Court has previously determined that "the FAR entrusts the critical determination of 'what does or does not constitute relevant past performance to that [Agency's] considered discretion.'" *Linc Gov't Servs.*, 96 Fed. Cl. at 718 (quoting *PlanetSpace v. United States*, 92 Fed. Cl. 520, 539 (2010)). Furthermore, the Court of Appeals for the Federal Circuit has determined that an Agency's "determination of relevance is owed deference as it is among the 'minutiae of the procurement process,' which this court 'will not second guess.'" *Glenn Defense Marine (Asia) v. United States*, 720 F.3d 901, 911(Fed. Cir. 2013) (quoting *E.W. Bliss Company v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).

This Solicitation has adequately described the method by which past performance will be evaluated. The RFP defines "relevant projects" as "contracts ongoing or completed that are of comparable magnitude and complexity" to those described in the DLITE II IDIQ PWS, the Force Projection, and STO Alpha. AR 1842. It further provided a detailed table, which broke down the total number of linguists by language and linguist category description. AR 1496. Offerors were informed through STO Alpha that the Army needed 1,135 linguists. AR 1742. The fact that WorldWide, along with eight other offerors, submitted a past performance proposal indicates that the information provided in the RFP is sufficient for offerors to bid intelligently.

The FAR provides that "[t]he source selection authority shall determine the relevance of similar past performance information." 48 C.F.R. § 15.305(a)(2)(ii). An Agency may use its discretion in making that determination without imposing an undue restriction on the offerors. *Linc Gov't Servs*, 96 Fed. Cl. at 717-718. Plaintiff argues that if, as WorldWide inferred from the Section C task, past relevant performance is in the $0.6 to $0.9 billion range, MEP is the only offeror who would not be excluded by this limitation. MJAR at 15. While no offerors will be disqualified based on a lack of relevant past performance, they will receive a neutral rating without it. AR 1857-58. Plaintiff argues that only MEP will receive a "higher than neutral" rating under the Solicitation as currently written, which provides them with an unfair advantage and prejudices all other offerors. MJAR at 15. This argument is inconsistent with plaintiff's allegation that the RFP is ambiguous. Essentially, WorldWide is simultaneously arguing that INSCOM needs to include a dollar value in the definition of relevant past performance, but that INSCOM cannot define relevant past performance as a contract of similar value to the current DLITE I contract because it would disqualify all offerors except MEP. MJAR at 14-15.

Even if MEP is the only offeror with past performance in the $0.6 billion dollar range, the Solicitation's definition of relevance is still not unduly restrictive. This Court previously determined in *Comp. Sciences Corp. v. United States*, that "an offeror's competitive advantage gained through incumbency is generally not an unfair advantage that must be eliminated." 51 Fed. Cl. 297, 311 (2002). An "agency is not required to neutralize the competitive advantages some potential offerors enjoy simply because of their own particular circumstances rather than any government action." *WinStar Communications, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998). Therefore, the simple fact that MEP's incumbency has provided an advantage over other

offerors does not require the Agency to redefine relevant past performance. The Solicitation, as it stands, is not unduly restrictive.

### D.      Sole Source Procurement

WorldWide alleges that the Solicitation, as written, violates the Competition in Contracting Act of 1984 ("CICA") by effectually creating a sole source procurement in favor of MEP. MJAR at 15. CICA requires that specifications in an RFP "permit full and open competition." 10 U.S.C. § 2305(a)(1)(B)(i). However, agencies are permitted to use restrictive provisions to satisfy agency needs. 48 C.F.R. § 11.002(a)(1)(ii). The Agency need only show that the terms at issue are "rationally derived" to meet the Agency's needs. *See CHE Consulting, Inc. v. United States*, 74 Fed. Cl. 742, 748 (2006).

WorldWide's allegations that the Solicitation is a *de facto* sole source procurement are based on its argument that only MEP has the requisite past performance to win the award. MJAR at 5. As previously iterated, nothing in the Solicitation indicates that offerors without relevant past performance will be eliminated. AR 1857. In fact, the Solicitation stresses that the most important factor in evaluating offerors is the Technical factor, which is completely separate from the Past Performance factor. AR 1853. An offeror can still receive a high technical score even if they lack the requisite relevant past performance. AR 1853-54.

Nine offerors, including WorldWide, have submitted proposals for the FP mission area. AR 1431. Surely, those offerors would not have submitted proposals that they knew they were not qualified to win. INSCOM has indicated that it intends to award up to ten FP mission area contracts. AR 1431. This fact alone belies any argument that this is a sole source procurement in favor of MEP.

### E.      Defense Base Act Insurance

At an agency-level protest to INSCOM on November 13, 2015, MEP argued that including DBA insurance in the total evaluated price created an "unfair competitive burden" on MEP because of its history performing in a heavy combat zone. AR 1121-27. INSCOM agreed that DBA insurance would detract from the ability to fairly evaluate offerors' prices. AR 1122. As a result, INSCOM excluded DBA insurance from the total evaluated price submitted by offerors. Plaintiff argues that INSCOM's motivation in making this decision was to ensure that MEP would maintain its viability as an offeror despite its high DBA rates. MJAR at 9. WorldWide further argues that, by removing the DBA insurance from the total evaluated price, INSCOM is essentially negating "any potential price advantage that a contractor with good risk mitigation can offer." MJAR at 20.

WorldWide argues that price cannot be evaluated for realism, reasonableness, and completeness if DBA insurance is excluded from the total evaluated price. MJAR at 24. WorldWide further alleges that, in excluding DBA insurance costs from the total evaluated price,

the Government has effectively removed price as a factor in the source selection.  MJAR at 25.
The FAR requires that the Government evaluate price, specifically stating that "[p]rice or cost to
the government shall be evaluated in every source selection."  FAR 15.304(c)(1).  However, the
FAR also states that "[t]he evaluation factors and significant subfactors that apply to an
acquisition and their relative importance are within the broad discretion of agency acquisition
officials."  FAR 15.304(c).  That the Agency included price in the evaluation of proposals is
sufficient.  Price need not be the most important factor in the Agency's evaluation.

The RFP states that "[p]rice is the least important factor and when the non-price factors
are combined, the non-price factors are significantly more important than the price factor."  AR
393.  This Court has previously held that "[t]he depth of an agency's price analysis is a matter
within the sound exercise of the agency's discretion and [the Court] will not disturb such an
analysis unless it lacks a reasonable basis."  *Biospherics, Inc. v. United States*, 48 Fed. Cl. 1, 10
(2000) (citation omitted).  Additionally, an agency "may not use an evaluation method that
produces a misleading result."  *Glenn Defense*, 97 Fed. Cl. at 577 (quotation omitted).

Plaintiff's argument that excluding DBA insurance from total evaluated price is
misleading centers around its opinion that DBA premiums can be controlled through risk
mitigation, as only part of DBA insurance deals with death as a result of "war-risk hazard."
MJAR at 22.  War-risk hazard is differentiated from death by other causes, and defined as "any
hazard arising during a war in which the United States is engaged; during an armed conflict in
which the United States is engaged, whether or not war has been declared; or during a war or
armed conflict [from various hostilities]."  41 U.S.C. § 1711.  In highlighting the difference
between types of loss, WorldWide is attempting to argue that DBA rates can be controlled by the
offeror.  They even posit that "MEP can control its non-war-risk hazard losses, but has
apparently elected not to do so."  MJAR at 23.  Plaintiff further posits that WorldWide has
significantly lower DBA premiums due to its successful implementation of comprehensive risk
mitigation for non-war-risk hazards.  MJAR at 23-24.  This argument is wrong.

Excluding DBA insurance costs from the RFP is within the discretion of the Government
and promotes fair and equal competition.  The RFP states that a reasonable price is one that
"should not exceed that which would be incurred by a prudent person in the conduct of a
competitive business."  AR 1055.  DBA costs are typically outside of the control of contractors,
particularly those contractors acting in combat zones.  AR 1929.  The contracting officer stated
that "[i]n accordance with [the contracting offeror's] knowledge of DBA price information from
other acquisitions, the fact that contract performance is within a combat zone is the main driver
behind the high DBA insurance rates."  AR 1961.  Additionally, "initial DBA proposed costs do
not reflect the likely costs the Army will see during performance."  AR 1962.  WorldWide has
low DBA costs because it does not have a history of performance in a heavy combat zone, like
the FP mission area.  AR 1910.  During the course of proceedings at the GAO, INSCOM
explained the following:

> [E]ven an offeror with a low DBA cost at the time of award due to lack of loss history
> will most likely face an increase in the cost of DBA insurance as it performs under the
> contract….Therefore, the result of including DBA cost in the total evaluated price is an
> unfair advantage to any offerer [sic] who has not performed this type of requirement in
> the past.  In accordance with the above, the Army determined the best way to fairly
> evaluate all offerers [sic] for this procurement with respect to DBA insurance was to
> exclude the price from the total evaluated price and evaluate DBA cost for realism,
> reasonableness, and completeness.

Id.  The low DBA costs at the time of the award are temporary and misleading, and those costs
will likely rise as the contractor performs under the contract.  As such, INSCOM chose to
exclude DBA costs from the total evaluated price to ensure that offerors with significant combat
experience "remain on equal footing" as those without similar combat experience.  AR 1961-62.

The burden is on the plaintiff to demonstrate that the Government had no rational basis in
excluding DBA costs from the total evaluated price.  Plaintiff has not satisfied that burden.
Furthermore, even if WorldWide had shown that the exclusion of DBA costs from the total
evaluated price was in error, plaintiff has failed to show they were prejudiced by that exclusion.
This Court has previously found that where "the protestor has shown a significant error in the
procurement process, the court must determine whether that error prejudiced the protestor,
because both error and prejudice are required for the protestor to prevail."  *Sims v. United States*,
112 Fed. Cl. 808, 815 (2013).  As INSCOM has repeatedly reiterated, the purpose of excluding
DBA costs was to promote competition and level the playing field for both experienced and
unexperienced contractors.  AR 1909-10.  The purpose was not to ensure that MEP alone was
awarded the contract.  Thus, this Court finds that the exclusion of DBA insurance costs from the
total evaluated price was a rational strategy to achieve fair and open competition.

### F.    Permanent Injunction

In addition to its failure to demonstrate success on the merits, WorldWide has failed to
show that the Agency's actions were arbitrary, capricious, or otherwise in violation of law, and,
as such, is not entitled to injunctive relief.  In addition to determining whether WorldWide has
succeeded on the merits, this Court must also determine (1) "whether the plaintiff will suffer
irreparable harm if this court withholds injunctive relief," (2) "whether the balance of hardships
to the respective parties favors the grant of injunctive relief," and (3) "whether it is in the public
interest to grant injunctive relief."  *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir.
2004) (citations omitted).

As iterated in 28 U.S.C. § 1491(b)(3), this court is statutorily required to "give due regard
to the interests of national defense and national security."  This Court held in *Linc Gov't Servs.*,
that "[o]f paramount import is the public interest in national defense and national security."  96
Fed. Cl. at 702 (citation and quotation omitted).  Furthermore, "when military and national
security interests are implicated, the public interest factor gains inflated importance in the court's

balancing of the equities." *Id*. "[W]hen these interests raise national security concerns, they place the weight of both the public interest and the balance of hardships firmly on defendant's side of the scale." *Id*.

Linguist services are of paramount importance when US Forces are abroad.  The FP contracts under the DLITE IDIQ contract expire on June 30, 2016.  Cotto-Arroyo Decl. ¶ 4 (Addendum).  A six-month extension may be awarded by INSCOM, allowing the DLITE I IDIQ contract to end on December 30, 2016.  *Id*. at ¶ 10.  In order for performance to commence on the DLITE II IDIQ contract on by December 30, 2016, INSCOM must award the contract by October 7, 2016.  *Id*. at ¶ 14.  For that to occur, final proposal revisions must be requested no later than June 3, 2016.  *Id*. at ¶ 16.  Therefore, any injunction requiring INSCOM to modify the Solicitation after June 3, 2016, would create a substantial risk of a gap in linguist services in Afghanistan, which would be detrimental to national security and defense.  As such, this Court denies plaintiff's Motion for Injunctive Relief.

## III.    Conclusion

For the reasons set forth above, plaintiff's MOTION for Injunctive and Declaratory Relief is **DENIED**.  Additionally, defendant and defendant-intervenor's CROSS-MOTIONS for Judgment on the Administrative Record are **GRANTED**.  The Clerk is directed to enter judgment on the Administrative Record in favor of defendant and defendant-intervenor, consistent with this Opinion.[2]

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge

---

[2] This opinion shall be unsealed, as issued, after June 17, 2016, unless the parties identify protected and/or privileged materials subject to redaction prior to that date.  Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons therefor.